IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 22, 2018

**STATE OF TENNESSEE v. HENRY COFRANCESCO, III**

**Appeal from the Criminal Court for Hamilton County**
**No. 299685   Don W. Poole, Judge**

_____

**No. E2017-01675-CCA-R3-CD**

_____

Defendant, Henry Cofrancesco, III, was indicted by the Hamilton County Grand Jury for vehicular homicide, possession of cocaine, failure to yield, leaving the scene of an accident involving the death of another person, failure to render aid, DUI, and DUI *per se*. Defendant entered guilty pleas to vehicular homicide and DUI *per se*, and the remaining counts were dismissed upon motion of the State. Defendant received a sentence of 11 months and 29 days for his DUI conviction, and the trial court sentenced Defendant to nine years' incarceration for his vehicular homicide conviction and merged the two convictions. In this appeal as of right, Defendant contends that the trial court abused its discretion by denying alternative sentencing. Following our review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ROBERT W. WEDEMEYER, J., joined.

Wencke West and Jonathan Wilson, Cleveland, Tennessee, for the appellant, Henry Cofrancesco, III.

Herbert H. Slatery III, Attorney General and Reporter; Linda D. Kirklen, Assistant Attorney General; Brent A. Cooper, District Attorney General; and Patrick Powell, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Facts*

The State gave the following factual basis for Defendant's guilty pleas:

If the State proceeded to trial, the State would show that in Hamilton County, Tennessee, on or about May 21st, 2016, a Saturday, at approximately 8 p.m., when it was still light out, CPD responded to a crash with injuries at 5900 Lee Highway. According to witness statements, roadway evidence and videos of the crash site, the defendant [ ] had been inside the bar, Images, drinking with his girlfriend.

After getting into an argument with his girlfriend, the defendant left the bar and sat in the car and was parked facing Lee Highway. Suddenly, the defendant pulled quickly forward over the curb into the roadway, directly in the path of the motorcycle driven by Robert Benedict. Mr. Benedict had been traveling west at the speed limit and there was no way for him to avoid [Defendant]'s vehicle. Again, all this is on video. Mr. Benedict died on the scene.

[Defendant] refused to do standardized field sobriety tests or to consent to a blood draw. A warrant for blood was obtained and defendant's blood alcohol content was .262. He also had amphetamine in his system at a level less than 0.05 micrograms per milliliter[ ]. The defendant has no previous DUI convictions within the statutory period.

## Sentencing hearing

Michelina Ralston prepared the presentence report. The report showed that Defendant had prior convictions for traffic offenses in 2001, 2002, and 2007. Defendant stated that he had "never used illegal drugs or used alcohol to excess." Ms. Ralston completed Defendant's "Strong-R" assessment, which includes self-reported information by Defendant and is used to assess Defendant's likelihood to reoffend. Defendant had "an overall low risk score." Ms. Ralston testified that she did not have any reason to believe that Defendant was dishonest in his answers.

Joe Warren, of the Chattanooga Police Department, testified as an expert in crash reconstruction. He reviewed surveillance videos of the incident. He testified that it was daylight when the incident occurred. The offense occurred on a straight roadway that was well-marked. The victim was driving at a "safe . . . normal speed." Defendant "hopped the curb" and drove "directly into the path of the motorcycle." The victim had 1.3 to 1.5 seconds to react. Officer Warren testified that the average human's perception and reaction time is 1.5 seconds. The victim was unable to avoid the collision. The victim died at the scene.

Video from a nearby business showed Defendant and his girlfriend arrived at the bar, Images, several hours earlier. Defendant exited Images and got into his car about ten minutes prior to the crash. Defendant's car was parked facing the highway. Instead of backing his car out of the parking spot and driving to one of the designated parking lot exits, he accelerated forward and drove over the curb directly into the victim's lane of travel. Officer Warren testified that Defendant's blood alcohol content was 0.262.

Stephen Cookston testified that he was driving approximately three or four car lengths behind the victim at the time of the collision. Mr. Cookston saw Defendant's vehicle pull out. He testified, "[t]here was no time for a reaction, it just happened." Mr. Cookson stopped to render aid to the victim. He saw Defendant "exit the vehicle, just kind of look around, [and] walk straight back to the bar."

Lisa Benedict, the victim's wife, testified that the victim was a kind-hearted person who loved his family. She testified, "he was a very dedicated husband and father and he had a great sense of humor, he was always telling jokes and the life of the party." He was killed "just shy" of their 29th wedding anniversary. On the day of the incident, she and the victim had attended their only daughter's high school graduation and a celebration lunch. Ms. Benedict testified that riding a motorcycle "was [the victim's] one way of releasing his stress, he loved to ride." He left "to take a quick trip downtown and just circle around downtown and come back." When Ms. Benedict learned of her husband's death, she was "in shock."

Ms. Benedict addressed Defendant directly. She testified, "[w]hat was so hard for me to hear was that you had no concern for my husband, you just got out and walked right past him and back into the bar, and as strangers were running to him, you were leaving him." She testified that the incident devastated her family. She testified, "I miss him every day. I cry for him every day and I need him every day." She asked the trial court to impose the harshest sentence possible and order Defendant to serve his sentence in confinement.

Reagan Benedict, the victim's daughter, testified that she had received a full scholarship to play softball at Chipola College in Florida, but she gave up the scholarship to stay home with her mother because she was afraid to leave her mother alone after the victim's death. She asked the trial court to impose "the maximum amount of time in prison for his actions and his bad choices that have so badly affected [her] and [her] family." She asked the court to consider Defendant's lack of remorse.

Colleen Adams, the victim's sister, read a statement to the court. She testified that the victim was smart, charismatic, and charming, and that he "had a passion for life that made him want to excel at everything he did." She testified that he had a good work

ethic and provided for his wife and daughter.  She testified that Ms. Benedict "was the love of his life and they had a relationship [they] all envied."  She testified that the victim's daughter "was his sun and his moon and his stars."  She asked the court "to send [Defendant] to prison for the maximum time allowed by law."

Gail Ann Benedict, the victim's sister, also testified.  She testified that the victim's wife "was inconsolable because she was not able to say goodbye to her husband, her soulmate, her best friend, and her daughter's father."  She testified that Defendant's failure to render aid was "unconscionable."

Defendant presented 19 letters of support and also presented testimony from relatives.  Canon Cofrancesco, Defendant's brother, testified that they had "a very tight-knit family."  He testified that Defendant was "the hardest working person [he'd] ever met."  He testified that Defendant was "the best person that [he] know[s]."  Regarding the offenses for which Defendant was convicted, he testified, "I'm in no way downplaying what happened, that was the stupidest thing, that is an inexcusable thing."  He testified that he was "greatly surprised" by Defendant's actions.  He testified that he was unaware of Defendant's use of illegal drugs.  He admitted that Defendant would drink to excess "to an extent."  He saw Defendant a few hours after the incident, and he described Defendant as "catatonic almost."  He testified that Defendant would not have walked past the victim had he been in "his right state of mind."

Richard Cooper, Defendant's uncle, testified that Defendant had "always been a family man, he loves his family."  Mr. Cooper was "floored" by the incident.  He testified that he "[n]ever had any indication" that Defendant would do something like this.  He testified that it "was an unfortunate incident, to say the least, but that's not [Defendant], the way he was being portrayed by this event."  He testified that Defendant "has accepted full responsibility."

Constance Cofrancesco, Defendant's mother, testified that Defendant "is not the person that he appears to have been that night."  She testified that she had never seen Defendant drink excessively.  She described Defendant as caring, generous, and sensitive.  She testified that Defendant was "dazed and confused" after the incident.  She had never seen Defendant as intoxicated as he was on the night of the offense.

Defendant stated in allocution that hearing the testimony "was the hardest thing that [he'd] ever had to sit through."  He stated that watching the video of the offense "sicken[ed] [him] at [his] actions" and it made him "question what was going through [his] mind that night."  He asked the court "for some degree of mercy," but he stated that he did not "in any way mean that to disrespect the memory of Mr. Benedict or the pain that [his family] continue[d] to endure."  He also apologized to his own family.

The State called Angela Bryant, Defendant's fiancée, in rebuttal. In 2010, a video was posted to Ms. Bryant's Facebook page with the caption, "It was the last shot that got me (Candana [sic] Mist)." The video showed Defendant vomiting after he had consumed too much alcohol. Ms. Bryant testified that Defendant did not drink excessively "on a regular basis." She testified that Defendant was "a good person, [and] a bad thing happened." On the night of the offense, she and Defendant were celebrating their upcoming marriage. She testified that Defendant suffered from hypertension. She testified that Defendant had no memory of the incident.

The trial court considered the purposes and principles of sentencing, the presentence report, and the testimony presented at the hearing, all of the statements provided by the victim's family and on behalf of Defendant, and the statistical information provided by Defendant. The court stated that Defendant's actions on the night of the offense were "somewhat reprehensible." The court also considered that cocaine was found in Defendant's car. The court also considered the Strong-R report, which indicated that Defendant was a low risk for reoffending.

In mitigation, the trial court found that by pleading guilty to the offenses, Defendant had spared the victim's family from having to go through a trial, and that "to a certain extent," Defendant had accepted responsibility. The court also found that Defendant had "strong family ties" and a good work history.

Regarding enhancement factors, the trial court noted that Defendant had prior traffic offenses, but the court stated, "[f]or the most part, . . . [D]efendant has a very very clean record." The trial court gave "great weight" to enhancement factor 10, that Defendant had no hesitation about committing a crime when the risk to human life was high, because the video showed that "there certainly was other traffic" on the road when the offense occurred.

The trial court sentenced Defendant to nine years for his vehicular homicide conviction. Regarding alternative sentencing, the trial court found that confinement was necessary to avoid depreciating the seriousness of the offense. The court also found that the facts of the offense were "excessive or exaggerated" because Defendant's blood alcohol content at the time of the offense was 0.262, which the court noted was "three and a half times the legal limit for drinking." The court noted that Defendant "dr[ove] over the curb, dr[ove] out into a busy highway, endangering not only other people, but killing [the victim]." The trial court ordered Defendant to serve his sentence in confinement.

*Analysis*

Defendant contends that the trial court abused its discretion by denying alternative sentencing. The State responds that the trial court properly denied alternative sentencing.

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). In *State v. Caudle*, 388 S.W.3d 273, 278-79, the supreme court expanded its holding in *Bise* to trial courts' decisions regarding alternative sentencing.

The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. T.C.A. § 40-35-401 (2017), Sentencing Comm'n Cmts. In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* T.C.A. § 40-35-210 (2017); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. T.C.A. § 40-35-103 (2017).

Under Tennessee Code Annotated section 40-35-103, the trial court should look to the following considerations to determine whether a sentence of confinement is appropriate:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

T.C.A. § 40-35-103(1) (2017).

At the time of the offense for which Defendant was convicted, a defendant convicted of vehicular homicide by intoxication was not statutorily prohibited from receiving alternative sentencing. *See* T.C.A. §40-35-303(a) (2014). Defendant was not, however, considered a favorable candidate for alternative sentencing. *See* T.C.A. §40-35-102(6). The record shows that the trial court considered the purposes and principles of sentencing as well as the factors relevant to imposing a sentence of confinement. The trial court denied Defendant's request for an alternative sentence based upon the need to avoid depreciating the seriousness of the offense. *See id*. § 40-35-103(1)(B). Tennessee courts have held that if the seriousness of the offense forms the basis for the denial of alternative sentencing, "'the circumstances of the offense as committed must be especially violent, horrifying, shocking, reprehensible, offensive or otherwise of an excessive or exaggerated degree,' and the nature of the offense must outweigh all factors favoring a sentence other than confinement." *State v. Bottoms*, 87 S.W.3d 95, 103 (Tenn. Crim. App. 2001) (quoting *State v. Hartley*, 818 S.W.2d 370, 374-75 (Tenn. Crim. App. 1991)); *see also State v. Trotter*, 201 S.W.3d 651, 654 (Tenn. 2006).

Defendant argues that the trial court erred when it found that the circumstances of the offense were excessive or exaggerated. Defendant cites three cases in which this court reversed the denial of alternative sentencing after finding that the facts of the cases were not "especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive or exaggerated degree." *See State v. Patrick Wayne Evans*, No. M2015-00897-CCA-R3-CD, 2016 WL 3992524 (Tenn. Crim. App. July 21, 2016), *no perm. app. filed*; *State v. Eunyce Marie Saunders*, No. E1998-00230-CCA-R3-CD, 2000 WL 739455 (Tenn. Crim. App. June 8, 2000), *no perm. app. filed*; *State v. Bingham*, 910 S.W.2d 448 (Tenn. Crim. App. 1995).

In two of the cases relied upon by Defendant, *Eunyce Marie Saunders* and *Bingham*, this court applied a de novo standard of review with a presumption that the determinations made by the sentencing court are correct because they were decided prior to our supreme court's opinion in *Bise*. *See* T.C.A. §§ 40-35-401(d), 40-35-402(d) (1997).

In *State v. Eunyce Marie Saunders*, a panel of this court concluded that the circumstances of the offense did not meet the standard in *Hartley*. 2000 WL 739455, at *10. The panel concluded that the record supported the trial court's finding that the

defendant had a poor potential for rehabilitation and that she had been untruthful and had failed to accept full responsibility for her criminal conduct. The evidence at trial showed that the defendant was driving twice as fast as the legal limit. The panel concluded, however, that there were "other indications that Defendant ha[d] a good potential for rehabilitation" in that she surrendered her driver's license and stated that she had no desire to ever obtain another driver's license. The panel noted that the defendant had no prior criminal history aside from one traffic ticket, and the panel stated, "we believe that there is very little risk that Defendant would commit another criminal offense during the period of an alternative sentence." 2000 WL 739455, at *10.

In *State v. Bingham*, this court concluded,

> while the results were indeed tragic, we are unable to conclude that the circumstances of the offense meet the standards announced in *Hartley*. Moreover, there are several factors that favor alternative sentencing. For example, the appellant is a youthful offender with absolutely no criminal history. She is a high school graduate with an excellent work record. Additionally, she has shown great remorse for her crime, and has devoted a great deal of time telling her story to high school students in an effort to persuade them against driving recklessly or while under the influence of alcohol.

910 S.W.2d at 454 (*overruled on other grounds by State v. Hooper*, 29 S.W.3d 1, 9-11).

In *Patrick Wayne Evans*, a panel of this court applied the *Bise* standard of review and stated, "we are unable to conclude that, although serious, the circumstances of this offense meet [the *Hartley*] standard." 2016 WL 3992524, at *12. In that case, the panel also held that the trial court had also misapplied five enhancement factors and failed to apply at least one mitigating factor. The panel concluded, "the numerous errors made by the trial court in ordering this sentence rebut the presumption of reasonableness afforded to a trial court's sentencing determinations. Given the circumstances of this case, we cannot be certain that the trial court would have sentenced the Defendant to serve his eight-year sentence, if it had not improperly applied enhancement factors, failed to apply appropriate mitigating factors, and properly considered alternative sentencing factors." *Id*.

In a recent Tennessee Supreme Court case, a panel of this court had reversed the trial court's denial of probation. The supreme court held that the record in the case simply was not sufficient to conduct an independent review of the sentence imposed by the trial court. The supreme court held,

[B]efore a trial court can deny probation solely on the basis of the offense itself, the circumstances of the offense *as particularly committed in the case under consideration* must demonstrate that the defendant committed the offense in some manner more egregious than is contemplated simply by the elements of the offense. Ergo, that a defendant killed someone while driving intoxicated is not sufficient, in and of itself, to deny probation because our legislature has determined that this crime is probation-eligible.

*State v. Trent*, 533 S.W.3d 282, 292-93 (Tenn. 2017) (emphasis in original).

We conclude that the trial court's decision in the case *sub judice* complies with the decision in *Trent*.

Defendant argues that the trial court improperly considered the victim's death in finding that the facts of the case were exaggerated and excessive. We agree that the fact of the victim's death is an element of the offense and cannot be the basis for which to deny alternative sentencing. However, our review of the trial court's ruling shows that the trial court did not rely on elements of the offense to deny alternative sentencing. Rather, the trial court considered the particular circumstances of the offense, including that Defendant hopped a curb and pulled onto a busy highway, directly into the victim's path. Defendant then walked away from the scene without rendering aid, which the trial court found to be "reprehensible." The trial court also deemed Defendant's blood alcohol content, at over three times the legal limit, as excessive. The trial court stated,

Number two . . . , confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deter[r]ent to others likely to commit similar offenses. I find, in regard to this case, that confinement is necessary to avoid depreciating the seriousness of the offense and I will state this: The law says, in regard to, in *State [v.] Hooper*, [29 S.W.3d 1 (Tenn. 2000)], that to find this thing, depreciate the seriousness of the offense, the Court must look and determine whether the conviction is especially, the facts are, especially violent, horrifying, shocking, reprehensible, offensive or otherwise excessive or exaggerated degree. I think this driving under the influence case that I've heard and the facts that have been presented and the plea that has been presented is excessive or exaggerated, because of this: The blood alcohol content in this case was .262. Three and a quarter, three and a half times the legal limit for drinking.

The event that happened that night, the pulling over the curb, without, and [defense counsel], certainly, on behalf of his – argues he's not driving around, but he got in a car in some situation and drives over the curb, drives out into a busy highway, endangering not only other people, but killing [the victim].

The trial court implicitly accredited "the good testimony of Investigator Joe Warren" who testified about "the circumstances of this accident that took [the victim's] life." Officer Warren had been a traffic investigator for approximately 17 years. He was specially trained in accident reconstruction and had authored articles for national magazines and trade magazines. He had also taught classes for "agencies throughout the southeast over the years." Officer Warren was also a motorcycle patrol officer. Officer Warren reviewed photographs of the crash scene, as well as "highly detailed three-dimensional scan, which essentially recreates the entire scene." He also observed the crash scene in person. Officer Warren testified, "I've worked dozens and dozens of motorcycle fatality crashes, [and] this is one of the rare cases that I've actually worked a motorcycle crash where the motorcyclist could not have done anything different, based on the video evidence and the roadway evidence that I looked at." Of particular significance was the fact that Defendant drove over the curb onto the highway, giving the victim almost no time to react. Officer Warren testified,

> [T]he crash occurred when [Defendant's vehicle] hopped the curb instead of going around through a driveway entrance or on a roadway entrance. As a rider, when I'm riding, I'm always examining the roadway ahead of me, including intersections, driveway access, looking for cars that may potentially be going to come out. One thing that doesn't pop up on my radar as a rider is people crossing a curb or going over a physical barrier out into my path, because that's just unusual, that doesn't normally happen. And so I would be watching intersections and stuff, so I wouldn't [have] see[n] [Defendant] coming either.

We also note the other circumstances that led to the offense, including the combined effect of Defendant's anger at his girlfriend as a result of an argument and his extremely high level of intoxication, which ultimately led to his commission of the offense. An extended period of drinking in a bar to reach a blood alcohol content of 0.262, leaving an argument with his girlfriend to go to his vehicle and suddenly driving onto a busy highway by entering it *not* from an access point but by "jumping" a curb is the exact type of egregious and shocking circumstances that justify the denial of alternative sentencing. The record supports the trial court's conclusion and its decision to deny alternative sentencing. Accordingly, we conclude that the trial court did not abuse its discretion in sentencing the Defendant.

- 10 -

Defendant argues that the trial court erred because it did not state in its ruling that the nature of the offense outweighed all of the factors favoring alternative sentencing. Although the trial court did not expressly state that the nature of the offense outweighed all of the factors favoring alternative sentencing, we conclude that the trial court's ruling reflects that the trial court implicitly made such a finding. The trial court weighed the factors supporting alternative sentencing. The trial court stated that it did not "think that [Defendant] lack[ed] the potential for rehabilitation." The trial court also weighed Defendant's family support and good work history in his favor. The trial court noted that Defendant had a clean criminal history; however, the trial court considered Defendant's three prior traffic offenses and weighed those against him. Having expressly considered the factors favoring alternative sentencing, the trial court found that the circumstances of the offense required a sentence of confinement.

Finally, Defendant argues that the trial court should not have considered the evidence of his blood alcohol content because the statutory scheme allowing the Tennessee Bureau of Investigation to collect a $250 fee from defendants upon conviction for DUI was held to be unconstitutional based upon *State v. Rosemary L. Decosimo*, No. E2017-00696-CCA-R3-CD, 2018 WL 733218 (Tenn. Crim. App. Feb. 6, 2018), *perm. app. granted* (Tenn. Mar. 21, 2018). This claim is without merit. The Tennessee Supreme Court has reversed the judgment of the Court of Criminal Appeals in *Decosimo*. *State v. Decosimo*, ___ S.W.3d ___, 2018 WL 4022338 (Tenn. Aug. 23, 2018).

## CONCLUSION

The trial court did not abuse its discretion when it denied Defendant's request for an alternative sentence. Accordingly, we affirm the judgment of the trial court.

_____
THOMAS T. WOODALL, JUDGE